NATURAL RESOURCES DEFENSE
COUNCIL, INC., et al.,
Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Respondent.

Edison Electric Institute,
et al., Intervenors.

No. 92–1371.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 5, 1993.

Decided May 27, 1994.

As Amended June 27, 1994.

David R. Case, argued the cause for petitioners. With him on the briefs was Eli D. Eilbott, Washington, DC. Joseph H. Guth, New York City, entered an appearance.

Eileen T. McDonough, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for respondent. With her on the brief were Lawrence E. Starfield, Asst. Gen. Counsel, and Randolph L. Hill, Atty., U.S. Environmental Protection Agency, Washington, DC.

On the joint brief for intervenors in support of respondent were G. William Frick, M. Elizabeth Cox, Toni K. Allen, Douglas H. Green, and Marianne Mancino Thiede, Washington, DC. Norman L. Rave, Jr., entered an appearance for intervenors Edison Elec. Institute, et al.

Before WALD, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Opinion dissenting in part and concurring in part filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

This petition for review challenges a final determination of the Environmental Protection Agency ("EPA") not to list used oil destined for disposal as a hazardous waste under subtitle C of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6921–6939b (1988). The agency evaluated used oil under its technical listing criteria, 40 C.F.R. § 261.11, and concluded that used oils destined for disposal need not be listed as a hazardous waste because the panoply of existing federal regulations governing the management of used oil, *id.* § 261.11(a)(3)(x), could control any plausible scenario of used oil mismanagement, *id.* § 261.11(a)(3)(vii). Petitioners charge that this determination was inconsistent with RCRA and the agency's listing regulations.

We disagree and therefore deny the petition for review.

## I. BACKGROUND

RCRA's subtitle C, 42 U.S.C. §§ 6921–6939b, establishes a " 'cradle-to-grave' regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste." *United Technologies Corp. v. EPA,* 821 F.2d 714, 716 (D.C.Cir.1987). Congress supplied only a broad definition of "hazardous waste" in RCRA,[1] delegating to EPA the task of promulgating regulations identifying the characteristics of hazardous waste and listing specific wastes as hazardous. 42 U.S.C. § 6921. In accordance with this statutory command, EPA has constructed two avenues through which a waste may be designated as "hazardous." We recently explained this bipartite system:

First, EPA has published several lists of specific hazardous wastes ("listed wastes") in which EPA has described the wastes and assigned a "waste code" to each one. 40 C.F.R. § 261, Subpart D. Second, EPA has identified four characteristics of hazardous wastes: ignitability, corrosivity, reactivity and ... toxicity. *See* 40 C.F.R. § 261.20–.24. Any solid waste exhibiting one or more of these characteristics is automatically deemed a "hazardous waste" subject to Subtitle C of the RCRA even if it is not a "listed" waste.

*American Petroleum Inst. v. EPA,* 906 F.2d 729, 733 (D.C.Cir.1990).

In order to determine which wastes should be regulated as "listed" hazardous wastes, EPA has developed a set of listing criteria. 40 C.F.R. § 261.11. In relevant part, these criteria provide:

(a) The Administrator shall list a solid waste as a hazardous waste only upon determining that the solid waste meets one of the following criteria:

irreversible, or incapacitating reversible, illness; or
(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.
42 U.S.C. § 6903(5).

---

1. Section 1004(5) of RCRA defines a "hazardous waste" as

a solid waste ... which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—
(A) cause, or significantly contribute to an increase in mortality or an increase in serious

(1) It exhibits any of the characteristics of hazardous waste identified in subpart C.

. . . .

(3) It contains any of the toxic constituents listed in appendix VIII and, after considering [a set of eleven] factors, the Administrator concludes that the waste is capable of posing a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed.

40 C.F.R. § 261.11 (1993).[2]

Petitioners here challenge EPA's final decision not to list used oil as a hazardous waste under these criteria. *See Final Rule,* 57 Fed.Reg. 21,524 (1992). This decision was years in the making. In 1984, Congress amended RCRA by passing the Hazardous and Solid Waste Amendments ("HSWA"), Pub.L. No. 98–616, 98 Stat. 3258 (1984) (now codified at 42 U.S.C. § 6935 (1988)). The HSWA set specific deadlines by which EPA was required to "make a final determination whether to list or identify used automobile and truck crankcase oil and other used oil as hazardous wastes under section 6921 [of RCRA]." 42 U.S.C. § 6935(b). Soon after the passage of the HSWA, EPA announced its proposal to list all used oil as a hazardous waste. *See* 50 Fed.Reg. 49,258 (1985). This proposal was followed by a supplemental notice requesting comments on another option: listing only used oil destined for disposal as hazardous while relying on special management standards to govern recycled used oil. 51 Fed.Reg. 8206 (1986).

In November 1986, EPA determined that it would not list recycled used oil as a hazardous waste. 51 Fed.Reg. 41,900 (1986). The agency's decision rested primarily on its perception that the stigma associated with labelling used oil as "hazardous" would discourage recycling. However, in *Hazardous Waste Treatment Council v. EPA,* 861 F.2d 270 (D.C.Cir.1988) ("*HWTC*"), we vacated EPA's no-list determination on the ground that the agency's reliance on the perceived "stigma" associated with listing was not a statutorily authorized basis for its decision. We remanded for the agency to consider whether any recycled oils met the technical criteria for listing promulgated under 42 U.S.C. § 6921.

After our decision in *HWTC,* the agency issued a supplemental notice of proposed rulemaking in which it published information collected since the 1985 proposal regarding the toxicity of used oil and announced that it was considering three options for the regulation of used oil: 1) listing all used oil as hazardous, 2) listing only certain categories of used oil as hazardous, or 3) not listing any used oils as hazardous, but relying instead on other federal regulations, including the "characteristic" waste component of RCRA subtitle C, to ensure the proper management of used oil. *See Supplemental Notice of Proposed Rulemaking,* 56 Fed.Reg. 48,000, 48,019–21 (1991). On May 20, 1992, EPA announced its decision not to list any used oil

---

**2.** The specific factors EPA is to consider in making its determination under 40 C.F.R. § 261.11(a)(3) are as follows:
(i) The nature of the toxicity presented by the constituent.
(ii) The concentration of the constituent in the waste.
(iii) The potential of the constituent or any toxic degradation product of the constituent to migrate from the waste into the environment under the types of improper management considered in paragraph (a)(3)(vii) of this section.
(iv) The persistence of the constituent or any toxic degradation product of the constituent.
(v) The potential for the constituent or any toxic degradation product of the constituent to degrade into non-harmful constituents and the rate of degradation.
(vi) The degree to which the constituent or any degradation product of the constituent bioaccumulates in ecosystems.
(vii) The plausible types of improper management to which the waste could be subjected.
(viii) The quantities of the waste generated at individual generation sites or on a regional or national basis.
(ix) The nature and severity of the human health and environmental damage that has occurred as a result of the improper management of wastes containing the constituent.
(x) Action taken by other governmental agencies or regulatory programs based on the health or environmental hazard posed by the waste or waste constituent.
(xi) Such other factors as may be appropriate.
40 C.F.R. § 261.11(a)(3)(i)–(xi).

destined for disposal as hazardous.[3] *See Final Rule,* 57 Fed.Reg. 21,524 (1992).

EPA determined that gasoline-powered engine oils do not need to be listed as hazardous wastes because most of these oils are already regulated under the characteristic waste component of subtitle C. *Final Rule,* 57 Fed.Reg. at 21,531. The agency further determined that other environmental regulations adequately address any additional risk posed by the plausible mismanagement of gasoline-powered engine oils. *Id.* With respect to the remaining oils, EPA determined that listing was not required because these used oils are not "typically and frequently" hazardous and thus did not meet the threshold requirement for listing. *Id.* To the extent that "[t]hose oils ... may pose a threat on disposal," the agency determined that they were also "addressed by the current regulatory framework." *Id.*

Petitioners, the Natural Resources Defense Council, the Hazardous Waste Treatment Council, and the Association of Petroleum Re–Refiners, challenge the EPA's no-list decision. They base their challenge on EPA's alleged noncompliance with RCRA and the agency's hazardous waste listing regulations, 40 C.F.R. § 261.11(a)(1)–(3).

## II. DISCUSSION

·A. *EPA's decision not to list gasoline-powered engine oils under 40 C.F.R. § 261.11(a)(1)*

■■■ Petitioners' first argument focuses on the EPA's failure to list used oils produced by gasoline-powered engines as hazardous waste. Intervenors in support of the EPA, American Petroleum Institute and Edison Electric Institute, *et al.,* argue that petitioners lack standing to raise this challenge, having failed to establish a constitutionally-cognizable injury. Intervenors assert that

these used oils are already regulated under RCRA subtitle C as "characteristic wastes" and that petitioners, therefore, cannot claim any injury from EPA's failure to regulate these oils under the "listed waste" component of the same regulation. Intervenors apply too stringent a standard for the determination of standing. The question at that threshold is not whether the allegation of injury is one upon which they will ultimately fail, but merely whether it states an injury cognizable in an Article III court. To establish an injury for standing purposes, a petitioner must show "a distinct and palpable injury to himself; that this injury is caused by the challenged activity; and that this injury is apt to be redressed by a remedy that the court is prepared to give." CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3531.4 at 418 (1984). Petitioners have alleged that "some of its members live in communities subject to incidents resulting from mismanagement of used oil." *HWTC,* 861 F.2d at 273. To the extent that there may be differences between regulation under the "characteristic waste" and "listed waste" components of subtitle C (for example in enforcement procedures) petitioners' alleged injury is arguably traceable to the EPA's failure to list used oils as a hazardous waste. *See id.* Though we ultimately determine that petitioners have not established a right to relief, that does not mean that they have not alleged a cognizable injury sufficient to cross the threshold of justiciability.

■■■ We now turn to the merits of the petition. Petitioners maintain that the agency's first listing criterion, 40 C.F.R. § 261.-11(a)(1), issued a straightforward directive to the Administrator to list these oils and that his decision not to do so must be set aside as contrary to law. · As recounted by the petitioners, EPA's listing regulation requires that

---

**3.** EPA's *Final Rule* announced the agency's decision to defer action on a listing determination and/or management standards for recycled used oils. *See Final Rule,* 57 Fed.Reg. at 21,524. On September 10, 1992, EPA issued a separate determination not to list recycled used oil as a hazardous waste. *See* 57 Fed.Reg. 41,566 (1992). On that same date, EPA also issued regulations governing the management of recy-

cled used oil. *Id.* Both the no-list determination and the management standards for recycled used oil have been challenged in *Safety–Kleen Corp. v. EPA,* No. 92–1629 (and consolidated cases) (D.C.Cir.). However, recycled used oils comprise no part of the instant case and all references in this opinion to "used oil" pertain only to used oil destined for disposal.

[t]he Administrator "shall" list used oil as a hazardous waste upon determining that "[i]t exhibits any of the characteristics of hazardous waste...." 40 CFR § 261.-11(a)(1).

Petitioners' Br. at 25. Because the EPA acknowledges that gasoline-powered engine oils often exhibit the toxicity characteristic, see *Supplemental Notice of Proposed Rulemaking*, 56 Fed.Reg. at 48,018–20, petitioners argue that the EPA violated its own regulations by failing to list gasoline-powered engine oils as a hazardous waste.

We might be inclined to agree with petitioners' interpretation of the above-quoted regulation, for as petitioners note, the regulation's use of the command "shall" would normally indicate that the Administrator lacks discretion to decline to list a waste that exhibits a hazardous characteristic. Unfortunately for petitioners, however, the regulation they quote is not the regulation that was officially promulgated and reported in the *Code of Federal Regulations*. That regulation provides:

(a) The Administrator shall list a solid waste as a hazardous waste *only* upon determining that the solid waste meets one of the following criteria:

(1) It exhibits any of the characteristics of hazardous waste identified in subpart C [i.e., ignitability, corrosivity, reactivity, and toxicity].

. . . .

40 C.F.R. § 261.11(a)(1) (emphasis added). Petitioners' argument that the Administrator was obligated to list gasoline-powered engine oils as a hazardous waste upon determining that they exhibit the toxicity characteristic thus rests on petitioners' convenient omission of the word "only" from their quotation of the regulation.

As EPA correctly notes, the restoration of this key word establishes that the finding of one of the three conditions is a prerequisite to its listing a particular waste as hazardous; but such a finding alone does not *obligate* EPA to list the waste. Thus, the regulation's inclusion of the modifier "only" drains the word "shall" of its compulsory connotation.

To argue otherwise would be to ignore basic principles of English usage. For example, a regulation directing that "pedestrians shall cross the street only upon determining that the light is green" clearly establishes that a green light is a prerequisite to street crossing. But few would argue that this familiar command *compels* one to venture forward as soon as the traffic signal permits. Similarly, in this case, the presence of the word "only" in EPA's listing regulation indicates that the Administrator was not required to list gasoline-powered engine oil as a hazardous waste simply because the agency found that such oils exhibit the toxicity characteristic.

Having been caught misquoting the key regulation at issue, petitioners' reply brief restores the word "only" to its proper place in the regulation, but argues that EPA was still required to list gasoline-powered engine oil under § 261.11(a)(1). Petitioners attack the agency's construction of the listing regulation, arguing that the word "only" cannot possibly be read to afford the agency discretion not to list a waste that meets one of the three listing criteria. Rather, petitioners claim that the word "only" functions solely to limit the factors the Administrator can consider in deciding whether to list a hazardous waste: The Administrator must render a decision based "only" on the promulgated criteria, without reference to any extraneous factors.

This interpretation suffers from the same flaw as petitioners' earlier construction—it fails to comport with common English usage. "Cross only if the light is green" obviously does not prohibit pedestrians from considering other factors (like an oncoming truck!) in deciding whether to cross. Furthermore, even if petitioners' construction of the regulation were tenable, that would only establish that the agency's listing regulation is ambiguous. It would not establish the kind of blatant inconsistency with regulatory language that would justify our rejection of EPA's interpretation of its own regulation. See *Stinson v. United States*, —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (agency's interpretation of its own regulation given controlling weight unless

"plainly erroneous"); *Hazardous Waste Treatment Council v. Reilly,* 938 F.2d 1390, 1395 (D.C.Cir.1991) (court must accept agency's construction of its own regulation unless it is "plainly wrong").

We do not mean to suggest, however, that EPA may rely on considerations outside its promulgated listing criteria in determining whether to regulate used oil as a hazardous waste. Our decision in *HWTC* expressly forbade EPA from basing its used oil listing determinations on such extraneous factors. However, *HWTC* did not rely on the presence of the word "only" in EPA's listing regulation to reach that result. Rather, in *HWTC,* we held that EPA must make its decisions based solely on its technical listing criteria because the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. § 6935(b), expressly directed EPA to make its listing determinations "under section 6921" of RCRA and its implementing regulations. *HWTC,* 861 F.2d at 274, 276.

EPA's interpretation of its listing regulation does not produce a contrary result. EPA is required by statute to base its used oil listing decisions exclusively on its technical listing criteria promulgated under RCRA section 6921. Within those confines, however, the regulation's inclusion of the word "only" grants the Administrator discretion to base a listing decision on any of the three grounds for listing set forth in the regulation. Thus, in this case, subsection (a)(1) would have permitted the Administrator to list used oil from gasoline-powered engines as a hazardous waste on the sole ground that these oils exhibit the toxicity characteristic. However, nothing in the regulation compelled the Administrator to make his listing determination under subsection (a)(1). Rather, the Administrator was free to make his listing determination under the balancing test set forth in subsection (a)(3), as he did in this case.

Petitioners make one further argument with respect to EPA's interpretation of the word "shall" in § 261.11 that is worthy of our mention. In paraphrasing its regulations, the EPA's *Final Rule* stated that subsection (a)(1) "*allows* the Administrator to list a waste" that displays the toxicity characteristic, while subsection (a)(3) requires that "a waste *shall* be listed" if it satisfies the (a)(3) balancing test. *Final Rule,* 57 Fed.Reg. at 21,528 (emphasis added). Because both the (a)(1) and (a)(3) criteria are prefaced by the common requirement that the "Administrator shall list a waste ... only upon determining" that it meets one of the regulatory criteria, 40 C.F.R. § 261.11, petitioners argue that the agency erred by giving seemingly contradictory interpretations to these two listing criteria. Petitioners urge the court to correct this alleged error by holding that the regulation's use of the command "shall" plainly compels the Administrator to list a waste as hazardous if *either* criterion is met.

■ For the reasons discussed above, we reject petitioners' contention that the regulations' use of the word "shall," as modified by the word "only," required EPA to give a mandatory construction to its listing regulation. Nor do we believe that the agency acted unreasonably in adopting what at first blush appear to be contradictory constructions of the (a)(1) and (a)(3) criteria. As evidenced by other listing determinations, EPA has unequivocally adopted an interpretation of § 261.11 that reserves to the agency considerable discretion in determining when to employ any of its three criteria to list a particular waste as hazardous. *See Final Rule* (Identification and Listing of Coke By-Products Wastes), 57 Fed.Reg. 37,284, 37,288 (1992). However, we see no reason why the agency should not be able to exercise this discretion wholesale in order to *limit* its discretion under any or all of its listing criteria—that is, to decide that it *will* categorically list every waste that meets a particular criterion. Such a choice seems particularly reasonable with respect to the subsection (a)(3) criterion, whose multi-factor balancing test still leaves a great deal of room for the exercise of agency expertise. *See* 40 C.F.R. § 261.11(a)(3) (setting forth eleven unweighted factors for the Administrator to consider in making listing determinations, the last of which allows the Administrator to consider "[s]uch other factors as may be appropriate"). Because we believe EPA's construction of its listing regulation was reasonable and consistent with the broad discretion af-

forded by the regulatory language, we see no reason to disturb the agency's decision to list any waste that fails the (a)(3) balancing test while reserving to itself the discretion not to list every waste that meets the conditions for listing under subsection (a)(1).

■ Of course, however reasonable the agency's interpretation of its regulations, we must not give those regulations effect if they conflict with the governing statute. Thus, if petitioners could establish that RCRA requires the EPA to list every waste that exhibits a hazardous characteristic, we would have to strike down the agency's discretionary listing regulations as inconsistent with the statute.

■ Petitioners try to find such a statutory command in RCRA's requirements that the Administrator "*shall* ... develop and promulgate criteria ... for listing hazardous waste," 42 U.S.C. § 6921(a) (emphasis added), and "*shall* promulgate regulations ... listing particular hazardous wastes" which "*shall* be based on the criteria promulgated under [§ 6921(a) ]," *id.* § 6921(b) (emphasis added). Petitioners argue that this statutory language grants EPA discretion to establish the technical criteria for listing, but imposes a mandatory duty on the Administrator to list all wastes meeting those criteria once the regulations are in place. Yet, to state that RCRA requires EPA to establish listing regulations and then comply with them begs the question whether the statute requires EPA's listing regulations to have any particular content. And we cannot find anywhere in RCRA that Congress specifically directed the EPA to promulgate its criteria in a manner that would trigger automatic listing whenever certain technical conditions are met. Rather, Congress's broad delegation to EPA to develop criteria for listing hazardous wastes, 42 U.S.C. § 6921(b), indicates that Congress intended the agency to have substantial room to exercise its expertise in determining the appropriate grounds for listing. *See Natural Resources Defense Council, Inc. v. EPA,* 907 F.2d 1146, 1159 n. 12 (D.C.Cir.1990) (RCRA "gives the Administrator broad discretion in determining the criteria for listing wastes and in listing specific wastes").

Furthermore, EPA's decision not to list every waste that exhibits a hazardous characteristic is consistent with the two-track waste management scheme designed by Congress. We have repeatedly recognized that RCRA directs EPA to identify hazardous wastes in two separate ways: first by identifying certain characteristics that render a solid waste hazardous, and second by listing specific solid wastes that are, "so to speak, *per se* hazardous." *Edison Elec. Inst. v. EPA,* 2 F.3d 438, 441 (D.C.Cir.1993); *see also American Petroleum Inst.,* 906 F.2d at 733. Both "characteristic wastes" and "listed wastes" are subject to the rigorous disposal requirements of subtitle C and represent distinct methods of regulation. Petitioners' position, however, would require EPA to list every waste that exhibits a hazardous characteristic. The effect would be to reduce the characteristic regulatory scheme to a mere "steppingstone" in the listing process. We therefore hold that neither RCRA nor the agency's regulations required EPA to list used oil from gasoline-powered engines on the sole ground that they exhibit the toxicity characteristic.

B. *EPA's decision not to list any used oils under 40 C.F.R. § 261.11(a)(3)*

Petitioners next argue that EPA misapplied its own regulations by declining to list any used oils under 40 C.F.R. § 261.11(a)(3). This section authorizes the agency to list a substance as a hazardous waste if, after considering a set of eleven factors, the agency determines that the substance "is capable of posing a substantial hazard when improperly ... disposed or otherwise managed." 40 C.F.R. § 261.11(a)(3). In deciding not to list used oils under the (a)(3) criterion, the EPA relied primarily on factors (vii) and (x). These factors are:

(vii) The plausible types of improper management to which the waste could be subjected....

(x) Action taken by other governmental agencies or regulatory programs based on the health or environmental hazard posed by the waste or waste constituent.

40 C.F.R. § 261.11(a)(3)(vii) & (x). In evaluating these factors, EPA examined nine other federal regulatory schemes, in each case noting the effect of the program on the disposal of used oil. *Final Rule,* 57 Fed.Reg. at 21,528–31. The agency concluded that this network of regulations could control any plausible scenario of used oil mismanagement. Therefore, the agency decided that used oil did not "pose a substantial threat to human health or the environment," and did not require listing under subsection (a)(3). *Id.* at 21,528, 21,531.

Petitioners raise two challenges to the EPA's evaluation of the (a)(3) factors. First, petitioners argue that the agency erred in relying on the regulation's seventh and tenth factors since, in petitioners' judgment, the "most important factors are the first listed." Petitioners' Br. at 33. Those factors include: the nature, concentration, potential for migration, persistence, and degradability of the toxic constituents. 40 C.F.R. § 261.-11(a)(3)(i)–(vi). Petitioners assert that these "most important" factors undisputedly supported listing used oil as a hazardous waste. However, "[d]espite the overwhelming weight of technical factors supporting the presumptive listing of certain used oils," the EPA read factors (vii) and (x) as negating the need for listing. This, petitioners argue,

amounted to an improper construction and application of the EPA's own regulations.

■ This challenge is easily dismissed. Petitioners do not contend that the Administrator failed to consider the relevant factors in making his no-list determination. In fact, they contend quite the opposite: that the Administrator considered the relevant criteria, but finding that many of the factors supported listing, erred in his final balancing. However, neither RCRA nor EPA's regulations purports to assign any particular weight to the factors listed in subsection (a)(3). That being the case, the Administrator was free to emphasize or deemphasize particular factors, constrained only by the requirements of reasoned agency decision-making. *See New York v. Reilly,* 969 F.2d 1147, 1150 (D.C.Cir.1992); *Lo Shippers Action Committee v. ICC,* 857 F.2d 802, 806 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2429, 104 L.Ed.2d 986 (1989).

■ Other than offering their opinion that some factors listed in subsection (a)(3) are "more important" than those relied upon by the Administrator, petitioners have properly raised only two additional arguments that remotely touch on the reasonableness of EPA's decisionmaking process.[4] First, peti-

---

4. In their reply brief, petitioners for the first time charge that the facts presented in the administrative record are insufficient to support the Administrator's conclusion that the existing network of environmental regulations can adequately control the disposal of used oil. *See* Reply Br. at 11–14. Petitioners buttress this late-breaking argument with numerous cites from the administrative record that, in petitioners' view, support their conclusion that improper management of used oil continues to cause environmental damage, in spite of the existence of other federal regulations. *Id.* However, because petitioners waited until the reply brief to raise this substantial evidence challenge, the Administrator was given no chance to respond, either by discounting the evidence cited by petitioners or pointing the court to record evidence supporting the Administrator's conclusion. "We have said before, and we say again, that ordinarily we will not consider arguments raised for the first time in a reply brief," *Pennsylvania Elec. Co. v. FERC,* 11 F.3d 207, 209 (D.C.Cir.1993), and we see no compelling reason to depart from that rule here. Consequently, we will not entertain petitioners' challenge. *See also Herbert v. National Academy of Sciences,* 974 F.2d 192, 195 (D.C.Cir.1992) ("To consider an argument for the first time in

reply would be manifestly unfair to the appellee [or respondent] who, under our rules, has no opportunity for a written response."); *Corson & Gruman Co. v. NLRB,* 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond.").

Judge Wald, whose dissenting opinion takes us to task for our restraint, does an admirable job of piecing together snippets from petitioners' opening brief that make it look as if petitioners had indeed raised their substantial evidence challenge in that document. However, the whole two sentences which Judge Wald claims properly presented this issue for appeal, *see* Dissent at 1078, were explicitly added only as explanatory support for petitioners' true legal argument—that the agency's interpretation of its own regulation, 40 C.F.R. § 261.11(a)(3)(vii) and (x), was inconsistent with RCRA and the agency's regulations. *See infra* at 1073. The section of petitioners' opening brief containing these sentences was captioned as follows: "EPA Misconstrued and Incorrectly Applied the Remaining Two [Regulatory] Factors in a Manner That Conflicts With the

tioners assert that EPA acted arbitrarily in relying on the existing network of federal regulations to ensure the proper disposal of used oil because no other environmental statute can regulate disposal as effectively as subtitle C's expansive, "cradle-to-grave" hazardous waste disposal mechanism. This argument, however, is foreclosed by the EPA's listing criteria themselves. EPA's listing regulation, the validity of which petitioners do not challenge, expressly requires the agency to decide whether a substance should be listed as a hazardous waste by considering, among other things, "[a]ction taken by other governmental agencies or regulatory programs" to control any hazard posed by the substance. 40 C.F.R. § 261.11(a)(3)(x). To accept petitioners' proposition that EPA may not rationally rely on other federal regulatory programs because none are as comprehensive as subtitle C would be to drain this factor of all content: EPA could never rely on other environmental regulations to control a potentially hazardous substance because no other environmental regulation can match the might of subtitle C. Furthermore, for the majority of used oils at issue in this litigation, EPA explicitly *relied on* RCRA's subtitle C regulation to govern their proper disposal. *See* 57 Fed.Reg. at 21,528. Although petitioners would prefer to have these used oils regulated as "listed" rather than "characteristic" wastes the fact remains that both types of wastes are subject to the demanding disposal requirements of subtitle C.

▮▮ Petitioners next contend that the Administrator acted arbitrarily in relying on the characteristic waste component of subtitle C to regulate many used oils because the test that waste generators must use to evaluate their waste samples for toxicity, the toxicity characteristic leaching procedure ("TCLP"), is not well suited to the task of identifying the toxic characteristics of oily substances. In support of this proposition, petitioners cite several instances in which EPA has, in other contexts, recognized the difficulties of applying the TCLP to oily wastes. *See, e.g.,* 55 Fed.Reg. 46,354, 46,371 (1990) (TCLP "tends to underestimate the leachability of hazardous constituents from oily wastes"); 55 Fed.Reg. 11,798, 11,851 (1990) ("It is particularly difficult to predict the behavior of oily wastes in the TCLP test."); *see also* Science Applications International Corp., *Used Oil Characterization Sampling and Analysis Program* (Aug. 30, 1991) (report prepared by EPA contractor) (indicating that clogging during TCLP "introduced potential measurement errors" into EPA's commissioned study of used oil toxicity). Petitioners contend that the Administrator's reliance on the characteristic waste component of RCRA was therefore unreasonable in that use of the imperfect TCLP may lead to the underregulation of hazardous used oils.

▮▮ To the extent that petitioners' argument sounds an attack on the validity of the TCLP itself, this petition for review does

---

Statute." Petitioners' Br. at 35. Any fair reading of that section demonstrates that petitioners intended to attack EPA's determination to rely on other environmental statutes *not* on the ground that the agency's decision lacked sufficient factual support in the record, but on the ground that the *"plain language and purpose* [of RCRA and the agency's regulation] forecloses EPA from concluding that any plausible mismanagement of used oil will not occur." Petitioners' Br. at 39 (emphasis added). In reading this argument, EPA would have been quite justified in taking the phrases to be just what petitioners intended them to be—additional, "policy-type" reasons why the court should accept petitioners' statutory and regulatory construction argument. These scattered assertions, buried in the middle of such a text-centered argument, would not fairly have alerted the agency that petitioners were planning an attack on the factual sufficiency of the administrative record.

In this circuit, our precedents require that petitioners lay all their arguments on the table in their opening briefs so that their opponents are not taken by surprise. While the dissent rightly points out that we sometimes make exceptions to that rule, such exceptions are properly granted only for arguments questioning the court's jurisdiction (which can be raised at any time) or where a "manifest injustice" might result from our failure to reach an argument, such as under our "plain error" analysis in criminal cases. *See Herbert,* 974 F.2d at 196. To adopt the analysis suggested by the dissent would be to create a new exception for what, to the judges' minds, look like "really important issues" or perhaps even "really good arguments" raised for the first time in reply. Believing that these are just the sorts of arguments for which respondents need to be prepared, we decline to open a new exception.

not present petitioners with a suitable forum for their challenge. EPA's *TC Rule*, which adopted the TCLP as the required test for identifying the toxic characteristics of all solid wastes, including used oil, became final on March 29, 1990. *See* 55 Fed.Reg. 11,798 (1990). Under RCRA section 7006(a), the time for petitioners to seek judicial review of that rule expired ninety days later. 42 U.S.C. § 6976(a)(1) (1988) (any petition for review of a regulation promulgated under RCRA must be filed within 90 days of EPA's final action). Having failed to raise a timely challenge to EPA's chosen method for assessing the toxicity characteristic in oily wastes,[5] petitioners cannot now raise a collateral challenge to that rule in the context of this litigation.[6] To the extent that petitioners' argument can be read as simply challenging the propriety of the Administrator's reliance on a properly promulgated, although perhaps imperfect, agency rule in making his no-listing determination, the argument is without merit. An agency seldom acts arbitrarily when it acts in conformity with its unchallenged rules.

■■■ Petitioners finally charge that even if it was permissible for the agency to rely on factors (vii) and (x) in making its no-listing determination, the EPA's application of those factors in this case must be set aside as inconsistent with RCRA and the agency's regulations. Factor (vii) directs the agency to consider "[t]he plausible types of improper management to which the waste could be subjected." 40 C.F.R. § 261.11(a)(3)(vii). Factor (x) requires that EPA consider "[a]c-

tion taken by other governmental agencies or regulatory programs based on the health or environmental hazard posed by the waste or waste constituent." *Id.* § 261.11(a)(3)(x). But, by considering the impact of other environmental regulations on the treatment of used oil, petitioners charge that EPA in effect relied on a *new* factor—"whether used oil will pose a hazard when *properly* managed in accordance with other Federal laws." Petitioners' Br. at 36. Because RCRA and EPA regulations require the agency to regulate hazardous waste that may pose a substantial threat "when *improperly* ... managed," 42 U.S.C. § 6903; 40 C.F.R. § 261.-11(a)(3) (emphasis added), petitioners charge that EPA construed its regulations in a manner inconsistent with its regulations and the governing statute.

We do not reach the merits of this challenge because petitioners failed to raise this question of statutory and regulatory construction before the agency during the notice and comment period. They have therefore waived their opportunity to press this argument in court. *See Ohio v. EPA*, 997 F.2d 1520, 1528 (D.C.Cir.1993); *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1308 (D.C.Cir.1991).

In its 1991 *Supplemental Notice of Proposed Rulemaking*, EPA specifically stated that it was contemplating not listing used oils and relying instead on other federal regulations to prevent any plausible harm from used oil disposal. 56 Fed.Reg. at 48,021. Nevertheless, petitioners did not argue during the rulemaking that EPA's reliance on

---

**5.** The validity of the TCLP as a method for identifying the hazardous characteristics of solid wastes, including used oil, was timely challenged on other grounds by numerous industry and environmental groups. *See Edison Elec. Inst.*, 2 F.3d at 438.

**6.** Nor can petitioners seek refuge in the "reopener doctrine" most recently articulated in *Edison Electric Institute v. EPA*, 996 F.2d 326, 331–32 (D.C.Cir.1993). That doctrine recognizes that " 'the period for seeking judicial review may be made to run anew when the agency in question by some new promulgation creates the opportunity for renewed comment and objection.' " *Id.* at 331 (quoting *Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C.Cir.1988)). However, the record in this case reveals nothing to suggest that EPA sought in its rulemaking to reopen debate on the

validity of the TCLP. Although EPA did mention that, in accordance with its rules, the TCLP would be relied upon to identify the toxicity characteristic of used oil, the agency neither solicited nor responded to comments addressing the validity of the TCLP as applied to used oil. *See Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 150 (D.C.Cir.) ("If in proposing a rule the agency uses language that can reasonably be read as an invitation to comment on portions the agency does not explicitly propose to change, or if in responding to comments the agency uses language that shows that it did in fact reconsider an issue, a renewed challenge to the underlying rule or policy will be allowed."), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990).

other federal regulations was forbidden by the statutory and regulatory command that EPA list substances that pose a substantial threat when *"improperly* managed." Nor did any other party make this claim. *See Ohio,* 997 F.2d at 1529 (court may excuse one party's failure to raise an issue in administrative forum where another party pressed and agency in fact considered identical issue).

Petitioners do not deny that they failed to raise their "improper management" argument before the agency.[7] Instead, they contend that their raising "various technical, policy, and legal" objections to the EPA's proposed non-listing was sufficient to preserve their right to press their statutory construction argument in court. We disagree.

■ We have previously held that failure to raise a particular question of statutory construction before an agency constitutes waiver of the argument in court. *See, e.g., Ohio,* 997 F.2d at 1528; *Linemaster,* 938 F.2d at 1308. In those cases, the parties were not saved by the fact that they had made other "technical, policy, or legal" arguments before the agency. Indeed, if such were the rule, a party could never waive a legal claim as long as the party in fact appeared and argued something before the agency. While there are surely limits on the level of congruity required between a party's arguments before an administrative agency and the court, respect for agencies' proper role in the *Chevron* framework requires that the court be particularly careful to ensure that challenges to an agency's interpretation of its governing statute are first raised in the administrative forum. *Linemaster,* 938 F.2d at 1308–09. We therefore hold that petitioners waived their argument regarding the correct construction of the phrase "improper management" as used in RCRA and the agency's implementing regulations.

---

7. At oral argument, counsel suggested that petitioners' comments had at least implied that EPA's proposal to rely on other federal regulations would be inconsistent with the agency's duty to consider the "improper management" of used oil. We asked counsel to supply the court with the full text of petitioners' comments. After examining these comments, however, we are still unable to discern any place in which petitioners could fairly be said to have raised this issue of statutory and regulatory construction.

## III. CONCLUSION

Nothing in RCRA or EPA's listing regulations required EPA to list used oils from gasoline-powered engines as a hazardous waste merely because they exhibit the toxicity characteristic and were thus eligible for listing under 40 C.F.R. § 261.11(a)(1). The agency was free instead to evaluate all used oils under the balancing test set forth in § 261.11(a)(3), as it did in this case. The agency's evaluation of used oil under subsection (a)(3) was reasonable and the petition for review is accordingly

*Denied.*

WALD, Circuit Judge, dissenting in part and concurring in part:

On December 18, 1978 the Environmental Protection Agency ("EPA" or "agency") announced its intention to list waste lubricating oils, hydraulic oils and cutting oils as hazardous under section 3001 of the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. § 6921. 43 Fed.Reg. 58,946, 58,957. Since that opening shot in 1978, however, the EPA's efforts to list used oil as a hazardous waste have followed a tortuous course of hide and seek. Today the majority permits the EPA to call off its latest effort to list used oil as hazardous without ever determining whether there is an adequate factual basis in the record for doing so.

### I. BACKGROUND

On May 19, 1980, in the course of announcing the regulatory criteria for identifying specific hazardous characteristics and listing particular wastes as hazardous, the EPA postponed any listing decision on used oil until some time that fall. 45 Fed.Reg. 33,-084, 33,086, 33,118. In November of that year, the listing decision was deferred again. 45 Fed.Reg. 74,884, 74,890. Responding to EPA inaction, Congress passed the Used Oil Recycling Act of 1980, sec. 8, Pub.L. No. 96–

463, 94 Stat. 2055, 2058 (uncodified), which required the EPA to "make a determination as to the applicability to used oil of the criteria and regulations ... relating to characteristics of hazardous wastes" and to submit to Congress a report "together with a detailed statement of the data and other information upon which the determination is based."

> In its January, 1981 report to Congress, [the] EPA indicated its intention to list both used oil and unused waste oil as hazardous under section 3001 of RCRA based on the presence of a number of toxicants in crude or refined oil (*e.g.*, benzene, naphthalene, and phenols), as well as the presence of contaminants in used oil as a result of use (*e.g.*, lead, chromium, and cadmium). In addition, the report cited the environmental and human health threats posed by these used oils and unused waste oils, including the potential threat of rendering ground water non-potable through contamination.

57 Fed.Reg. 21,524, 21,525 (May 20, 1992). *See* U.S. ENVIRONMENTAL PROTECTION AGENCY, LISTING WASTE OIL AS A HAZARDOUS WASTE: REPORT TO CONGRESS (1981), *reprinted in* Joint Appendix ("J.A.") 103. As then-Administrator Douglas M. Costle wrote in his accompanying letter to Congress, "[t]he information presented here will be used later this year to support the proposed listing of these waste oils as hazardous wastes." J.A. 105.

Three years later, the EPA had still not moved on the matter, leading Congress to put a "further prod" to the agency and adopt section 241 of the Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98–616, 98 Stat. 3221, 3258 (codified at 42 U.S.C. § 6935). H.R.REP. No. 98–198, 98th Cong., 1st Sess., pt. 1, at 64 (1983), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5623. The new legislation provided that the EPA shall "propose whether to list or identify used automobile and truck crankcase oil as hazardous waste" no later than November 8, 1985 and shall make a final decision on the matter no later than the following year. 42 U.S.C. § 6935(b). *Cf. Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 271–72

(D.C.Cir.1988) ("*HWTC*") (discussing history of used oil legislation).

On November 29, 1985, in near compliance with the congressional mandate, the EPA proposed to list used oil as a hazardous waste in 40 C.F.R. § 261.31. 50 Fed.Reg. 49,258, 49,270. As the factual basis for its decision, the agency invoked

> the used oil background document [which] provides a summary of approximately 80 major mismanagement incidents and the cost implications of cleanup operations ($10,000 to $5,150,000 per site). The mismanagement issue is not confined to on-site management of used oil, as evidenced by the fact that seventy (70) of these incidents occurred off the generation site. The media affected include surface water (35 sites), ground water (24 sites), drinking water (17 sites), air (8 sites), and soil (25 sites).
>
> Treatment, storage, and disposal of used oils in tank and container storage facilities (25 sites), surface impoundments (36 sites), and other improper disposal facilities (35 sites), burning operations (7 sites), and use of waste oil as a dust suppressant (3 sites) have resulted in the pollution of ground or surface water with lead, chlorinated organics, or aromatic organics from these wastes.
>
> In summary, the Agency has determined that used oil typically contains toxic constituents at concentrations that are of concern, that these constituents are mobile, persistent, and bioaccumulative, and capable of migration in hazardous concentrations, and, therefore, that these wastes are capable of causing (indeed, repeatedly have caused) substantial harm if mismanaged. Consequently the Agency is proposing to add used oil to the lists of hazardous wastes.

*Id.* at 49,267. The EPA, however, subsequently underwent a change of heart regarding *recycled* oil (in contradistinction to used oil destined for disposal which is at issue here) and issued supplemental notices suggesting special management standards and a no-list decision for *recycled* oil. 51 Fed.Reg. 8206 (Mar. 10, 1986).

Shortly before the expiration of its one year deadline for final action by the EPA on the listing of used oil, Congress passed the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (codified in scattered sections of the United States Code), which gave the EPA additional authority to regulate *recycled* oil without listing it as hazardous. The EPA's final decision did not list recycled oil citing as its principal reason that the stigmatic effects of such a listing would discourage recycling. 51 Fed.Reg. 41,900 (Nov. 19, 1986).[1] The EPA also deferred, once again, the listing of used oil destined for disposal, apparently on the argument that such a listing would have a spillover stigma effect on recycling used oil. *Id.* at 41,903. The listing decision as to used oil was now scheduled for "[m]id 1988." *Id.* at 41,904.

Mid–1988 passed without any decision. In October of that year, a panel of this court held that the EPA's decision not to list *recycled* oil based on stigma concerns was contrary to law because the Act "does not permit the Agency to consider these stigmatic consequences in deciding whether to list recycled oil as a hazardous waste." *HWTC,* 861 F.2d at 271. The court held that the EPA was obligated to reconsider "whether *any* recycled oils meet the *technical* criteria for listing." *Id.* at 277 (emphasis added).

In March, 1990 when the EPA had still not acted on used oil destined for disposal, the NRDC filed suit in federal court. *NRDC v. EPA,* No. 90–0694, 1992 WL 469734 (D.D.C. filed March 26, 1990). The EPA thereupon entered into a consent decree, promising to issue a final determination by May 1, 1992, and the agency published a supplemental notice of proposed rulemaking to that effect on September 23, 1991. 56 Fed.Reg. 48,000.

In addition to replicating earlier studies in its accompanying justification, the EPA presented "updated information" it thought useful to "determine the status of ... used oils

with respect to the toxicity characteristic." *Id.* at 48,006. The new study broke down used oil into several categories, one of which was oils from gasoline-powered engines (*i.e.,* automotive crankcase, gasoline-powered marine craft, and piston-engine aircraft). *See* Science Applications International Corporation, Used Oil Characterization Sampling and Analysis Program (1991) ("SAIC report") (prepared for EPA under contract), *reprinted in* J.A. 218. The EPA found oil from gasoline-powered engines to contain toxicants detectable by its toxic characteristics test ("TCLP"), as well as other toxicants not detectable by that test.

The supplemental notice presented three options: (1) list all used oils as hazardous waste, (2) list as hazardous used oils that typically and frequently exhibit toxic constituents at levels of concern, such as used oil from gasoline-powered engines, and (3) list no oils as hazardous and rely mainly on management standards for recycled oil promulgated under RCRA section 3014(a), 42 U.S.C. § 6935, as well as the RCRA regulatory scheme that would be triggered when any batch of used oil, whether destined for disposal or recycling, individually exhibits toxic or other hazardous characteristics. 56 Fed.Reg. at 48,019–21. The notice "recognizes that this [third] option is not completely comprehensive because the EPA lacks the authority to impose Federally-enforceable regulation on the disposal of [as opposed to recycling of] nonhazardous used oil. Therefore, a suboption that the Agency is considering would combine aspects of Options Two and Three to list used gasoline-powered engine crankcase oil when disposed." *Id.* at 48,021.

In discussing the threat of used oil to the environment within the existing regulatory landscape, the supplemental notice described numerous examples of mismanagement and "potential pathways ... for used oil to cause

---

**1.** This claim was somewhat surprising in light of the agency's 1980 statement that the "EPA does not agree with the largely unsubstantiated claims of commenters that controlling the use and recycling of hazardous waste will necessarily discourage *bona fide,* environmentally sound re-use and reclamation activities.... Commenters' claims about the chilling effect of regulating recycle and re-use activities also seem somewhat exaggerated. In many cases, Federal or State regulation of these activities should legitimatize, not stigmatize, them in the eyes of the public and increase the flow of wastes to well-operated facilities." 45 Fed.Reg. 33,084, 33,092 (May 19, 1980).

damage to the environment." *See id.* at 48,-034. The EPA pointed out:

Past mismanagement of used oils has resulted in significant environmental damage, which the Agency has documented extensively. Of the 445 National Priorities List (NPL) facilities having documented Records of Decision, 185 (42%) have had used oils co-disposed with other hazardous or industrial solid waste....

In addition, the 1981 Report to Congress on used oil includes damage incidents and examples of severe threats to human health and the environment. As explained in that Report, used oil mixed with hazardous wastes has been shown to have toxic or carcinogenic effects on humans. Also, used oil that is mixed with solvents or other hazardous wastes when burned created products of incomplete combustion ... [which] are of particular concern due to their carcinogenic nature.

. . . .

An investigation of 25 Superfund sites that involved the mismanagement of used oil found used oil contamination of surface and ground waters, soils, and surrounding lands and crops. In several cases wildlife damage or wildlife death has been documented. Further, over 60 damage incident summaries indicate contamination of surface water, while over 30 incidents involve soil contamination, and a few contain evidence of air contamination.

... EPA notes that many of the potential risks to human health and the environment from the mismanagement of used oil, as documented above, are present regardless of the type of used oil that is released to the environment, particularly the contamination of ground water and effects on plant and animal life.

*Id.* at 48,033–35. The SAIC report concluded: "Based on the preponderance of damage incidents involving used oil and on the quantity of scientific literature assessing the effects, EPA believes that used oil presents a significant environmental hazard." SAIC report at 1 (J.A. 277). In other words, the existing regulatory scheme was not doing the job of protecting the environment from the dangers of used oil disposal.

The NRDC's submitted comments argued forcefully that more needed to be done than sitting back and riding the current regulatory tracks. The NRDC specifically opposed the no-list option, documented countless instances of mismanagement and drew on the "California experience [which] shows that listing used oil as a hazardous waste leads to an increase in the responsible handling of used oil." Comments of NRDC at iii (Nov. 13, 1991), *reprinted in* Supplemental Appendix ("Supp.A.") 1, 6. *See also id.* at 4–1 to 4–5 (Supp.A. 54–58); Comments of Evergreen Oil Inc. at 5 (Nov. 6, 1991) (Supp.A. 71, 75). While some commenters charged that the EPA's study *underestimated* the dangers of used oil, they argued that even on the basis of that "data, EPA cannot simply ignore the impacts of plausible mismanagement scenarios in deciding at what point to list used oil as hazardous." Evergreen at 19 (Supp.A. 89). *See also id.* at 18 (Supp.A. 88). For example, while there have been some changes "over the last decade," such as the "lead phase-down in gasoline, ... Evergreen's most recent test data ..., like the EPA's, continue to show significant levels of lead [in used oil]." *Id.* at 26 (Supp.A. 96). And although the EPA had asserted that "the types of mismanagement historically associated with used oil may no longer be plausible *if* subject to Federal enforcement [of oil management standards]," 56 Fed.Reg. at 48,021 (emphasis added), as one commenter pointed out, "[t]his statement assumes that EPA will devote substantial resources to enforcing new used oil management standards" and that "[n]o such commitment of resources has been made by the agency." *Id.* at 32 (Supp.A. 102).

Nonetheless, on May 20, 1992, the EPA issued its final decision not to list used oil as a hazardous waste. The EPA did not change its position on the toxicity of used oil, but, relying on factors (vii) ("plausible types of improper management") and (x) ("actions taken by other governmental agencies or regulatory programs") of the multi-factor test in 40 C.F.R. § 261.11(a)(3), concluded that "the current regulatory structure controlling the management of used oil destined for disposal provides adequate controls so that used oil will not pose a substantial

threat to human health or the environment." 57 Fed.Reg. 21,524, 21,528. The EPA explained:

> After assessing the extent and potential success of current regulatory programs and their effect on the disposal of used oil, the Agency believes that the existing network of regulations provides protection from plausible disposal mismanagement scenarios, as discussed below.

The "discuss[ion] below," however, consisted solely of a laundry list of current regulations. *See* 57 Fed.Reg. at 21,528–31. The record reflected—so far as any party has pointed out—no further attempt on the EPA's part to "assess the extent and potential success" of existing regulations in preventing or cleaning up pollution caused by used oil.

## II. THE INSTANT APPEAL

In addition to the statutory construction issue discussed by the majority (with which I generally agree), the NRDC makes two additional challenges on appeal: first, that the EPA, without adequate support, ignored the *record which demonstrates* that mismanagement is widespread and poses considerable danger to the environment; and second, that the EPA unjustifiably disregarded plausible mismanagement scenarios by presuming waste generators' compliance with every regulatory constraint on the books. The panel majority, resting on principles of appellate briefing and administrative exhaustion, refuses to consider the merits of either challenge, holding that the NRDC's first argument was not properly raised on appeal and that its second was not properly raised below. I disagree.

In its opening brief, the NRDC challenged the EPA's determination that other environmental statutes controlled any plausible mismanagement scenarios. "Each of the other environmental statutes relied on by EPA in its challenged determination address only narrow aspects of used oil management." Brief for Petitioners at 38 (citation omitted). According to NRDC, the EPA's decision inexplicably ignores "[t]he record below [which] documents countless instances of environmental damage due to mismanagement of used oil." *Id.* To be sure, in the opening brief, this argument was wedded to the NRDC's second, related attack which was phrased in terms of regulatory interpretation of factors (vii) and (x) of 40 C.F.R. § 261.-11(a)(3), *i.e.,* the NRDC's challenge that the EPA failed to consider *improper* management of used oil and wrongly presumed that waste management would always be conducted in compliance with every regulatory stricture. The wider thrust of the NRDC's first challenge, however, was not lost on the EPA.

In its responding brief, the EPA argued that it "considered the impact of existing federal regulatory programs on the management and disposal of used oil," that used oil exhibiting a hazardous characteristic "was already subject to RCRA" regulation and that

> [w]ith respect to the remaining used oils, which do not exhibit the toxicity characteristic, the [a]gency concluded that a variety of federal regulations control the plausible types of improper management to which used oil could be subjected to a sufficient extent so that there is no substantial threat to human health or the environment from the improper management of used oil.

Brief for Respondent at 12 (citations omitted). The agency, according to the EPA's brief, "relied on [the regulations'] cumulative impact," *id.* at 13, "considered scenarios that were unregulated," *id.* at 14, and "concluded that existing federal regulations controlling the management and disposal of used oil were sufficient to avoid any substantial risk that the improper management of used oil could cause harms to human health or the environment," *id.* at 17. In support of its conclusion, the EPA then presented the same roadmap of the regulatory landscape upon which it had relied in the rulemaking. *Id.* at 19–21. It also mustered the only "factual" support ever noted for its decision to ignore the documented mismanagement scenarios, arguing "that the mismanagement incidents described in the 1991 Notice ... occurred prior to many of these regulations." *Id.* at 21 n. 16. The EPA ended by reiterating that "[a]fter evaluating all available information, EPA rejected [the] option [to list used oil as hazardous]." *Id.* at 36.

At this point, the NRDC, I believe, was entitled in its reply brief to elaborate upon

its original challenge that the EPA had ignored scores of documented instances of mismanagement. Its actual retort that indeed there was *no* "available" information supporting the EPA's conclusion that the current regulatory scheme was successfully protecting the environment and controlling plausible scenarios of mismanagement was a reasonable counter to the EPA's assertion that existing regulations were adequate to the task. The NRDC repeated its initial thrust, arguing that "[t]o the contrary, the administrative record is stacked high with reports documenting that improper management of used oil has caused, and continues to pose, substantial environmental hazards." Reply Brief for Petitioners at 11–12 (citations omitted). According to the NRDC, the reported damage incidents were "as recent as the administrative record could contain," *id.* at 12, and the EPA itself had found earlier that mismanagement occurred despite existing laws, *id.* at 13. The NRDC concluded that "[t]here is not one report in the record—not one iota of evidence—to support EPA's conclusion that current laws adequately control used oil mismanagement." *Id.* at 14.

Contrary to the majority, I do not believe this is an appropriate instance for invoking our prudential doctrine that we will not consider arguments made for the first time in a reply brief. *See* Majority Opinion ("Maj. Op.") at 1071–72 n. 4. The basis for that rule is, of course, that allowing novel arguments to be introduced so late would be "manifestly unfair to the appellee who, under our rules, has no opportunity for a written response," and would "risk the possibility 'of an improvident or ill-advised opinion.'" *Herbert v. National Academy of Sciences,* 974 F.2d 192, 196 (D.C.Cir.1992) (quoting *McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 800 F.2d 1208, 1211 (D.C.Cir.1986)). Here, in

contrast, we risk reaching an improvident outcome by refusing to review the factual basis (or lack thereof) for the EPA's decision.

This is not a case where the EPA lacked notice of the NRDC's challenge to the record evidence supporting a no-list decision. In addition to the fact that the NRDC's challenge to the record sufficiency appeared in its opening brief, the EPA already had abundant notice of petitioners' position that no such evidence existed as a result of extensive comments during the rulemaking. During the rulemaking, petitioners flat out challenged that the EPA had absolutely no record evidence supporting a no-list decision. For example, after discussing mismanagement scenarios, the Safety–Kleen Corporation maintained that "[t]he Agency's previous and new data do not support the option of not listing used oil" and that "[t]here is no factual or regulatory basis for Option Three." Comments of Safety–Kleen Corp. at 9 (Nov. 6, 1991), *reprinted in* Supp.A. 59, 68. The Evergreen Oil Company similarly argued that "[t]he factual record simply does not support a no or limited listing decision." Comments of Evergreen Oil, Inc. at 29 (Supp.A. 99).

To hide behind our prudential rule of not recognizing arguments raised for the first time in a reply brief, then, sidesteps an issue that was adequately raised in the dialogue between petitioners and respondents in this case.[2] I am "confirmed in this belief by the fact that the [EPA] itself never claimed to have been deprived of reasonable notice" of the NRDC's inadequate evidence claim. *Bangor Hydro–Elec. Co. v. Federal Energy Regulatory Comm'n,* 925 F.2d 465, 467 n. * (D.C.Cir.1991).[3]

This point is important because, as I read the record, the NRDC's challenge to record evidence for a no-list decision prevails on the

2. Given that reasonable minds may differ on how clearly the NRDC's opening brief challenged the evidentiary support for a no-list decision, we could well have ordered supplemental briefing to provide the EPA with an additional opportunity to address this important and consequential issue.

3. We have even said,
[N]otwithstanding the requirements of Federal Rule of Appellate Procedure 28, regarding the

contents of briefs on appeal, we may also consider points not raised in the briefs or in oral argument. Our willingness to do so rests on a balancing of considerations of judicial orderliness and efficiency against the need for the greatest possible accuracy in judicial decision-making. The latter factor is of particular weight when the decision affects the broad public interest.

merits. Only recently we held that the EPA could not presume without evidentiary support that hazardous waste would be managed in a particular, undesirable manner. *Edison Elec. Inst. v. EPA*, 2 F.3d 438 (D.C.Cir.1993). In that case the "record evidence on which EPA relie[d did] not demonstrate" that the wastes to be regulated "ha[d] ever been disposed of" in the manner projected by the EPA. *Id.* at 446. We held that "the [a]gency must at least provide some factual support for its conclusion that such a mismanagement scenario is plausible." *Id.* I see no reason why the same standard should not apply equally to projected good management as to bad. Here, while the EPA has laid down the framework of environmental regulation with respect to used oil, it has not yet cited to any assessment or evaluation in the record of whether, *empirically*, the current regulatory scheme renders mismanagement sufficiently "implausible" so as to justify a no-list decision. So far, it has simply sketched out the regulatory landscape—the abstract theory, not practice. It has in no wise met the NRDC's challenge that mismanagement scenarios continue to occur even with the regulations in place. I would remand for a fuller explanation and discussion of that challenge before permitting the EPA to rely upon that factor to demonstrate that listing is unnecessary.[4]

### III. CONCLUSION

Over the course of the last fifteen years the EPA has repeatedly announced that it would seek listing used oil as hazardous under the RCRA. Each time it began its venture with a host of reasons arguing in favor of a decision to list, and each time it ended its rulemaking in withdrawal. In the latest effort, the EPA has, I believe, failed to provide adequate factual cover for its final retreat. I would therefore remand the case to the EPA for a fuller explanation of its decision, including an assessment of the success of the current regulatory regime in preventing used oil from contaminating our environment. The majority avoids that result by relying upon a prudential rule of pleading I think to be inappropriately invoked here especially in view of the high stakes involved for clean air, soil, and groundwater. The EPA needs to make its case that existing regulation of used oil is enough; to require less would turn rulemaking and appellate review into a game of hide and seek, in this case more hide than seek.

---

*Consumers Union of United States, Inc. v. Federal Power Comm'n*, 510 F.2d 656, 662 (D.C.Cir.1975) (footnotes omitted).

4. The NRDC also urges that the EPA may not presume waste generators' compliance with applicable regulations, but must indeed posit that other regulations are being ignored. The majority rejects consideration of this challenge on the basis that it was not properly raised below. *See* Maj.Op. at 1073–1074. Because I would remand the case on the grounds discussed in the text, I find no reason to discuss this regulatory interpretation claim in any detail. I note only that this claim appears to run counter to the language of the regulations which expressly permits the EPA to consider other regulatory schemes, 40 C.F.R. § 261.11(a)(3)(x), and "plausible" scenarios of mismanagement, *id.* at § 261.11(a)(3)(vii), in deciding whether to list any given waste as hazardous. We would effectively be excising these two factors from the regulations were we to require that the EPA always posit the complete ineffectiveness of every other regulatory system. *Cf. United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (applying principle of statutory construction "to give effect, if possible, to every clause and word of a statute" (internal quotes and citation omitted)).