PENNSYLVANIA ELECTRIC
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Pennsylvania Public Utility Commission;
Penntech Papers, Inc., Intervenors.

Nos. 92–1408, 92–1542.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 12, 1993.

Decided Dec. 21, 1993.

James B. Liberman, New York City, argued the cause, for petitioner. With him on the briefs was, Douglas E. Davidson, New York City.

Randolph Lee Elliott, Attorney, F.E.R.C., Washington, DC, argued the cause, for respondent. With him on the brief was, Jerome M. Feit, Sol., F.E.R.C. Jill L. Hall, Atty., F.E.R.C., Washington, DC, entered an appearance.

Shawn P. Leyden, Newark, NJ, John T. Stough, Jr., and Kevin M. Downey, Washing-

ton, DC, were on the brief, for amicus curiae Public Service Elec. and Gas Co.

Lawrence F. Barth, Halifax, PA, John F. Povilaitis, Harrisburg, PA, and Veronica A. Smith, Hermitage, PA, entered an appearance, for intervenor Pennsylvania Public Utility Com'n.

Michael L. Kessler, Washington, DC, entered an appearance for, intervenor Penntech Papers, Inc.

Before: BUCKLEY and RANDOLPH, Circuit Judges, and LEVIN H. CAMPBELL,* Senior Circuit Judge.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Pennsylvania Electric Company ("Penelec") entered into a Transmission Services Agreement with Penntech Papers, Inc. and submitted it to the Federal Energy Regulatory Commission for filing on March 11, 1991. One year later FERC accepted the Agreement for filing on condition that Penelec charge Penntech a different, and lower, rate for providing transmission service than that set forth in the Agreement. *Pennsylvania Elec. Co.*, 58 F.E.R.C. ¶ 61,278 (1992). Penelec now petitions for review of FERC's original order; FERC's order denying Penelec's rehearing request, 60 F.E.R.C. ¶ 61,034 (1992); and FERC's notice rejecting Penelec's further request for rehearing, 60 F.E.R.C. ¶ 61,244 (1992).

Penelec is a public utility providing electric service in central, western and northern Pennsylvania to retail customers under rates regulated by the Pennsylvania Public Utility Commission and to wholesale-for-resale customers under rates regulated by FERC under the Federal Power Act, which requires that rates be "just and reasonable." 16 U.S.C. §§ 824d & 824e.

Penntech is the owner of a cogeneration facility located about seven miles from Penelec's transmission system. A cogeneration facility generates electricity from steam or other forms of energy "used for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A); 18 C.F.R. § 292.-202(c). Penntech entered into a contract, on October 31, 1988, with Niagara Mohawk Power Corporation to sell to Niagara in New York that portion of its electrical output Penntech did not need for its industrial operation. The New York Public Service Commission approved Niagara's purchase.

Penntech had two options for delivering its power to Niagara: (1) build a 7.5–mile, 115 KV line connecting Penntech's cogeneration facility with a Penelec substation and then have Penelec deliver—"wheel"—the power to Niagara over Penelec's 115 KV transmission line; or (2) build a 58–mile, 115 KV line running from Penntech's cogeneration facility directly to Niagara. Penntech decided to pursue option 1 and, to this end, negotiated the Agreement with Penelec that is the subject of this case.

The Penelec–Penntech Agreement submitted to FERC stated that in return for Penelec's transmission service, Penntech would pay a rate made up of three components. The first component was the rate Penelec charged its existing, or native load, customers—the standard firm transmission rate, or as it is sometimes called, the standard embedded-cost transmission rate. Under the Agreement, this component (currently $1.629 per kilowatt per month), which reflects the average costs of the transmission system, would generate yearly charges of $1.2 million. The second component, which Penelec called an "increased energy cost component," was of a different sort. Estimated to be approximately $200,000 per year, this component was designed as a means of reimbursing Penelec, and ultimately its native load customers, for lost savings. Penelec explained that it had been using its transmission system to transfer "economy" electric energy from sources to its west, energy costing less than that Penelec or its affiliates generated. These transfers enabled Penelec to lower its costs of serving its wholesale and retail customers. In view of the capacity of its trans-

---

* Of the United States Court of Appeals for the First Circuit, sitting by designation pursuant to

28 U.S.C. § 294(d).

mission system, however, Penelec would sometimes have to forego transferring economy energy if it provided firm transmission service to Penntech. The parties agreed to cap this "increased energy cost component" at $1.362/kW/month, representing Penelec's cost of expanding its transmission system sufficiently to eliminate this constraint. The third component included administrative and other costs; it is not at issue and we will disregard it.

In its order of March 10, 1992, and its orders denying rehearing, FERC approved the Penelec–Penntech arrangement on condition that the parties agree to a rate consisting of the higher of *either* the embedded cost rate *or* the increased energy cost rate capped at the cost of expansion. *See* 58 F.E.R.C. at 61,873; 60 F.E.R.C. at 61,120–21; 60 F.E.R.C. at 61,816. Before considering the basis of this ruling and Penelec's challenge to FERC's rationale, we will address Penelec's complaint about the manner in which FERC acted.

■ Penelec's procedural complaint begins with the observation, made in its opening Brief (at p. 8), that FERC's "conditional acceptance" of its Agreement with Penntech amounted to a rejection of it. The observation is undoubtedly accurate. But Penelec waited until its Reply Brief (at pp. 5–7) to set forth a legal argument attacking this mode of decisionmaking. Not until then did Penelec contend that under section 205 of the Federal Power Act, FERC's authority was limited to accepting the rate for filing, suspending it for a maximum of five months and holding an evidentiary hearing to determine its lawfulness.[1] We have said before, and we say

again, that ordinarily we will not consider arguments raised for the first time in a reply brief. *See, e.g., Herbert v. National Academy of Sciences,* 974 F.2d 192, 196 (D.C.Cir. 1992); *Rollins Envtl. Servs. v. EPA,* 937 F.2d 649, 652–53 n. 2 (D.C.Cir.1991). We perceive no reason for relaxing the bar here, particularly since Penelec's counsel candidly admitted during oral argument that the company's filing, which presented no factual issues, would not have warranted an evidentiary hearing in any event. *See Municipal Light Bds. v. FPC,* 450 F.2d 1341, 1345–46 (D.C.Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

■ This brings us to the substance of the conditions imposed on the Agreement and FERC's reasons, originally and on rehearing, for imposing them. As FERC saw it, the Agreement posed the issue whether Penelec, in addition to charging its standard embedded-cost rate, could also recover "opportunity costs." Opportunity costs, FERC explained, "are incurred by a utility when the utility accommodates a third party's request for transmission service (*i.e.,* wheeling request) and thereby foregoes an opportunity to reduce its own costs, to the economic detriment of the utility's native load customers." *Pennsylvania Elec. Co.,* 58 F.E.R.C. at 61,-871. FERC has indicated that it might permit a utility to recover such opportunity costs in addition to the standard rate. From its prior decisions in *Northeast Utilities Service Co. (Re Public Service Co. of New Hampshire),* 58 F.E.R.C. ¶ 61,070 (1992) ("*NU I* "), and *Northeast Utilities Service Co.,* 58 F.E.R.C. ¶ 61,069 (1992) ("*NU II* "),[2] FERC extrapolated two principles to guide its reso-

---

1. Section 205(e) reads in part:

Whenever any ... new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate ... and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate ... but not for a longer

period than five months beyond the time when it would otherwise go into effect; and after full hearings ... the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate ... shall go into effect.... 16 U.S.C. § 824d(e).

2. *See Northeast Utils. Serv. Co. v. FERC,* 993 F.2d 937 (1st Cir.1993), reviewing several FERC decisions involving Northeast Utilities Service Co., including *NU I,* which the court sustained.

lution of the issue here—(1) native load customers of the utility providing the transmission service should be held harmless; and (2) in providing firm transmission service to a third party, the utility should charge the lowest cost-based rate.[3] *See Pennsylvania Elec. Co.*, 58 F.E.R.C. at 61,873. FERC concluded that if Penelec charged Penntech only the embedded cost rate this would satisfy both principles,[4] but if Penelec also recovered an amount equalling opportunity costs, the resulting rate would not be the lowest cost-based rate. The $1.2 million per year recovered from Penntech would cover the opportunity costs ($200,000 per year), with $1 million left over as a contribution to the fixed costs of the system, which the native load customers currently paid.

Of course Penntech was willing to pay more than FERC permitted. Penelec seizes on this point, stressing the voluntary nature of the Agreement and the fact, recounted in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973), that when Congress enacted the Federal Power Act it "rejected a pervasive regulatory scheme for controlling the interstate distribution of [electric] power in favor of voluntary commercial relationships." FERC has two answers, both of which we regard as decisive.

■ First, all transmission service, even that resulting from voluntary arrangements, must be provided at a just and reasonable rate. FERC's responsibility under section 205 is to ensure just and reasonable rates for native load customers and for third parties. Whether a rate satisfies this requirement is to be determined by FERC, not the parties to an agreement, however voluntary their agreement may be. *Cf. Tejas Power Co. v. FERC*, 908 F.2d 998, 1003 (D.C.Cir.1990).

Second, Penelec had proposed a cost-based rate. FERC's review therefore did not "rest on the presence or absence of arm's-length negotiation between the parties or the market power, if any, of the transmitting utility." 58 F.E.R.C. at 61,875; *see* 60 F.E.R.C. at 61,124.[5] It depended instead on whether, under the Agreement, Penelec would merely be holding its native load customers harmless for the increased costs or would be recovering significantly more, so that Penntech would wind up providing a subsidy for those customers. Simple mathematics shows that the Agreement would lead to the latter.[6] As

3. In its Brief (at p. 17), Penelec stresses that unlike this case, *NU I* dealt with a third party's request for *non-firm* transmission service. Why this should make a difference Penelec never explains and we therefore do not consider the point further.

4. FERC also said that if Penelec charged only a rate equalling opportunity costs, this would be permissible. However, because the embedded cost rate of $1.629/kW/month is higher than the cap on the opportunity cost of $1.362/kW/month, FERC assumed that Penelec would charge the embedded cost rate. *See* 58 F.E.R.C. at 61,874.

5. Penelec challenges FERC's use of its analysis in *NU*, arguing that *NU* is fundamentally different because it involved the risk of anticompetitive pricing in the context of a merger. FERC treated its *NU* ratemaking discussion as generally applicable to third-party transmission arrangements. *See* 58 F.E.R.C. at 61,871–73. We discern no reasonable ground for disagreeing with the agency's approach. It is true that in addition to the principles of holding native load customers harmless and ensuring that the utility charges the lowest cost-based rate for the transmission service, *NU I* stated a third principle not entirely applicable here—to "prevent the collection of monopoly rents by the transmission owner and promote efficient transmission decisions." 58

F.E.R.C. at 61,203. But, as FERC held, the reasons behind the first two ratemaking principles are not necessarily dependent on the precise extent of a particular utility's market power. Section 205, imposing on FERC the duty of conducting an independent review of rates, assumes that public utilities may abuse their market power. *See Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 758–59, 93 S.Ct. 1870, 1877–78, 36 L.Ed.2d 635 (1973).

6. As to the mathematics, FERC explained the matter this way:

[If Penelec charged Penntech only the standard rate] Penelec's native-load customers not only would be no worse off than if Penelec did not provide service to Penntech, but in fact would be *better off* because Penelec could charge Penntech approximately $1 million more than its opportunity costs. Penelec could apply the $1 million to defray the amount of the native-load customers' contribution to the fixed costs of the existing transmission system. Clearly, the "or" condition does not harm Penelec's native load and, in fact, benefits native load. 60 F.E.R.C. at 61,126. The underlying assumption, which all parties seem to share, is that a general rate decrease would be necessary before customers could receive any benefit from the

FERC also reasoned, Penelec's argument in favor of the Agreement's rate amounted to charging for the same transmission capacity twice: once for using the capacity to wheel Penntech's power, for which it proposed charging the basic rate; and once again for using the capacity to transfer economy energy to its native load customers, for which it proposed charging Penntech a rate equal to the amount not saved. *See* 58 F.E.R.C. at 61,873.

 Utility customers should normally be charged rates that fairly track the costs for which they are responsible. *See Town of Norwood v. FERC*, 962 F.2d 20, 25 (D.C.Cir. 1992); *Union Elec. Co. v. FERC*, 890 F.2d 1193, 1198 (D.C.Cir.1989). At least this is the premise upon which FERC regulated in this case and "we are obliged to defer to its technical ratemaking expertise" so long as it has supplied sufficient reasoning backed up by substantial evidence, as it has in this case. *Alabama Power Co. v. FERC*, 993 F.2d 1557, 1560 (D.C.Cir.1993). Having considered and rejected the other arguments Penelec raised, we therefore deny its petition for review.

*So Ordered.*

---

additional revenue Penelec received from Penntech. If Penntech were to pay both the embedded cost rate and the increased energy charge, the embedded-cost rate might be lowered further, to account for the additional revenue, thereby subsidizing the native load customers at Penntech's expense.