United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 2, 1998 Decided January 15, 1999 

 No. 92-1665

 Western Massachusetts Electric Company, 

 Petitioner

 v.

 Federal Energy Regulatory Commission, 

 Respondent

 Pittsfield Generating Company, L.P., 

 and Masspower, 

 Intervenors

 Consolidated with 

 Nos. 94-1290 & 97-1726

 On Petitions for Review of Orders of the Federal 
 Energy Regulatory Commission

 David B. Raskin argued the cause for petitioner. With 
him on the briefs was Frederic Lee Klein.


 Samuel Soopper, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With him on 
the brief were Jay L. Witkin, Solicitor, and John H. Conway, 
Deputy Solicitor. Edward S. Geldermann, Attorney, entered 
an appearance.

 Before: Henderson, Randolph, and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: Western Massachusetts Electric 
Company--WMECO--petitions for review of six orders of 
the Federal Energy Regulatory Commission asserting juris-
diction over certain interconnection agreements and ordering 
the cost of grid upgrades associated with the interconnections 
to be rolled into WMECO's rate base rather than be borne 
exclusively by the interconnecting facilities. For the reasons 
that follow, we deny the petitions for review.

 I

 The Altresco Agreements

 Altresco-Pittsfield Limited Partnership1 operates a 165 
MW cogeneration plant located adjacent to a General Electric 
facility in Pittsfield, Massachusetts. In 1988, the Altresco 
plant was certified as a "qualifying facility" under the Public 
Utility Regulatory Policies Act of 1978 (PURPA). See 16 
U.S.C. ss 824a-3(j) and 796(17) & (18). Altresco's certifica-
tion as a qualifying facility allows it to compel electric utilities 
to purchase the power it generates and to require intercon-
nection with those purchasing utilities in order to facilitate 
such sales. See 18 C.F.R. s 292.303(a) & (c).

 Beginning in 1989, Altresco entered into a series of con-
tracts with WMECO under which Altresco would intercon-
nect with WMECO's transmission grid. The purpose of the 

__________
 1 Altresco-Pittsfield is now known as Pittsfield Generating Com-
pany, L.P. For the sake of consistency with the Commission's 
orders in this case, we will continue to refer to it as Altresco.

interconnection was to enable WMECO to transmit Altresco-
generated power across its grid to the New England Power 
Company (NEPCO); WMECO would not itself purchase any 
of Altresco's output. The agreements set out the terms and 
conditions under which WMECO was to construct, operate, 
and maintain the interconnection. The interconnection itself 
was to be accomplished by means of a radial line from 
Altresco's generating facility to a point on WMECO's grid. 
According to studies performed by WMECO, the Altresco 
interconnection required certain lines and substations on the 
grid to be upgraded in order to preserve the grid's reliability. 
Altresco was to bear the $3.9 million2 cost of the interconnec-
tion, including the cost of the upgrades to WMECO's grid.

 Believing that the Altresco interconnection agreements 
would be subject to state rather than federal regulatory 
authority, WMECO filed the agreements with the Massachu-
setts Department of Public Utilities rather than with the 
Commission. In 1989 and 1990, WMECO negotiated trans-
mission service agreements with NEPCO under which 
WMECO would wheel Altresco-generated power to NEPCO. 
These transmission agreements were filed with the Commis-
sion. The Commission responded on April 24, 1992, with an 
order setting the transmission rates for hearing and also 
asserting jurisdiction over the interconnection agreements 
themselves. See Western Massachusetts Elec. Co., 59 
F.E.R.C. p 61,091, at 61,343 (1992).

 WMECO requested a rehearing on the question of the 
Commission's jurisdiction over the interconnection agree-
ments, arguing that PURPA gives state authorities jurisdic-
tion over interconnections between utilities and qualifying 
facilities. It further argued that the agreements did not fall 
within the Commission's jurisdiction because they involved 
facilities rather than services, because they were all pre-
operational, and because they did not involve the interstate 
transmission of power.

__________
 2 This figure includes $2.98 million for grid upgrades, $510,000 for 
the radial line connecting Altresco to the WMECO grid, and 
$450,000 for feasibility and engineering studies.

 In a November 1992 order, the Commission rejected 
WMECO's arguments and denied its request for rehearing on 
the question of jurisdiction. See Western Massachusetts 
Elec. Co., 61 F.E.R.C. p 61,182 (1992). The Commission 
relied on s 205(c) of the Federal Power Act, 16 U.S.C. 
s 824d(c), and on 18 C.F.R. s 292.303, the regulation setting 
out the obligation to interconnect. Section 205(c) provides for 
Commission jurisdiction over "all contracts which in any 
manner affect or relate to [transmission] rates, charges, 
classifications, and services, [which are subject to the jurisdic-
tion of the Commission]." 16 U.S.C. s 824d(c). The agree-
ments "relate to" transmission rates, the Commission held, 
because the purpose of the interconnection was to facilitate 
transmission of Altresco-generated power to NEPCO. 
Therefore the agreements fell within the Commission's juris-
diction under s 205(c).

 The Commission also held that the regulation assigning 
jurisdiction over interconnections to state authorities did not 
apply in this case because WMECO had no obligation to 
interconnect under s 292.303. WMECO was providing only 
transmission service; it was not purchasing any of Altresco's 
output. As the Commission saw it, s 292.303 does not extend 
the obligation to interconnect "to utilities located between the 
buyer and the seller that provide transmission service." 61 
F.E.R.C. at 61,662. When there is no obligation to intercon-
nect, the regulation providing for state regulatory authority 
over interconnections, 18 C.F.R. s 292.306(a), does not apply. 
The Commission concluded, therefore, that these agreements 
were fully within its jurisdiction.

 The Commission's orders of April and November 1992 
asserting jurisdiction and denying rehearing are the subject 
of WMECO's December 1992 petition for review in this 
Court, No. 92-1665.

 The Commission ordered an evidentiary hearing before an 
administrative law judge to determine the "justness and 
reasonableness" of assigning to Altresco all costs associated 
with the interconnection agreements. Western Massachu-
setts Elec. Co., 63 F.E.R.C. p 61,039, at 61,197 (1993). In the 


hearing, WMECO argued that the entire cost, including the 
cost of the grid upgrades, was directly related to the intercon-
nection and therefore could properly be assigned to Altresco. 
The Commission staff countered that only the $510,000 cost of 
the radial line from Altresco's plant to the WMECO grid was 
assignable to the interconnection itself. The remaining 
amount, in the staff's view, should be allocated to system 
upgrades, upgrades that should be rolled into the rate base 
and recovered from all WMECO customers.

 The ALJ ruled that the statute did not support the Com-
mission's interpretation of what constitutes interconnection 
costs. See Western Massachusetts Elec. Co., 64 F.E.R.C. 
p 63,028, at 65,127 (1993). According to the ALJ, nothing in 
PURPA or in the Commission's regulations implementing 
PURPA limits interconnection costs to the cost of radial lines. 
Because the local grid upgrades were directly related to the 
interconnection, the ALJ concluded that it was just and 
reasonable for WMECO to assign to Altresco the entire cost 
incurred under the interconnection agreements, including the 
cost of the grid upgrades.

 In a December 1996 order, the Commission reversed the 
ALJ's initial decision with regard to the cost of the grid 
upgrades. It agreed with the testimony of staff witness 
Tekumalla that the upgrades provided a system-wide benefit 
and concluded that, because "the cost of the reinforcements 
must be treated as grid-related costs rather than as intercon-
nection costs," it was proper for WMECO to recover the cost 
of the upgrades from all customers on the grid through 
rolled-in rates. See Western Massachusetts Elec. Co., 77 
F.E.R.C. p 61,268, at 62,120 (1996). The Commission denied 
a request for rehearing. See Western Massachusetts Elec. 
Co., 81 F.E.R.C. p 61,152, at 61,692 (1997). The orders 
reversing the ALJ and denying rehearing are the subject of 
WMECO's December 1997 petition for review, No. 97-1726.

 The Masspower Agreements

 Masspower owns a natural-gas-fired cogeneration plant in 
Springfield, Massachusetts. The plant is a qualifying facility 
under PURPA. In 1991, WMECO agreed to interconnect 

Masspower's plant with the WMECO transmission grid. The 
interconnection was intended to allow WMECO to purchase a 
portion of Masspower's output and to wheel the rest of it 
across its transmission grid to other purchasers. As with the 
Altresco agreements, the Masspower agreements included 
upgrades to the transmission grid and required the qualifying 
facility to bear all the costs associated with the interconnec-
tion, including the cost of the upgrades. Because, in the 
Altresco proceedings, the Commission had already asserted 
jurisdiction over agreements similarly involving the transmis-
sion of qualifying-facility energy to other producers, WMECO 
filed the Masspower agreements and proposed transmission 
rates with the Commission, rather than with the state regula-
tory authority.

 In support of its cost assignment to Masspower, WMECO 
argued that the grid upgrades were necessitated by the 
interconnection and that they were actually less expensive 
than a radial line would have been. The agreements assigned 
all interconnection and grid reinforcement costs to Masspow-
er, and the proposed transmission rates included additional 
charges for customers receiving Masspower energy. Such a 
plan, the Commission held, would result in the over-collection 
of costs, contrary to the Commission's transmission pricing 
guidelines. Accordingly, the Commission ordered WMECO 
to file revised charges assigning the costs of the interconnec-
tion--but not of the grid upgrades--to Masspower. The 
Commission denied WMECO's request for rehearing in Feb-
ruary 1994. See Western Massachusetts Elec. Co., 66 
F.E.R.C. p 61,167 (1994). The order to file revised charges 
and the order denying rehearing are the subject of 
WMECO's April 1994 petition for review, No. 94-1290.

 II

 The consolidated petitions present two central questions. 
The first is whether the Commission's assertion of jurisdiction 
over the Altresco and Masspower interconnection agreements 
was "inconsistent with the regulation" or was a "plainly 


erroneous" interpretation of the Commission's regulations.3 
See Auer v. Robbins, 117 S. Ct. 905, 911 (1997) (citing Bowles 
v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)); see 
also Robertson v. Methow Valley Citizens Council, 490 U.S. 
332, 359 (1989); United States v. Larionoff, 431 U.S. 864, 
872-73 (1977). The second is whether the Commission prop-
erly determined that WMECO may not assign the cost of the 
grid upgrades to the qualifying facilities.

 A

 As to the jurisdictional question, three regulatory provi-
sions must be considered: the provision governing a utility's 
obligation to purchase power from a qualifying facility; the 
provision governing indirect purchases from a qualifying facil-
ity; and the provision governing a utility's obligation to 
interconnect with a qualifying facility.

 The purchase obligation, as contained in s 292.303(a), 
states that "Each electric utility shall purchase ... any 
energy and capacity which is made available from a qualifying 
facility: (1) Directly to the electric utility; or (2) Indirectly to 
the electric utility in accordance with paragraph (d) of this 
section." 18 C.F.R. s 292.303(a).

 Paragraph (d) of s 292.303 governs indirect purchases from 
a qualifying facility. It states:

__________
 3 WMECO challenges not only the Commission's jurisdiction over 
the Altresco agreements, but also its jurisdiction over the Masspow-
er agreements. Although WMECO "reserve[d] its rights to contest 
jurisdiction as may be necessary and appropriate," the orders in the 
Masspower proceedings do not indicate that the company actually 
contested the Commission's jurisdiction. See, e.g., Western Massa-
chusetts Elec. Co., 63 F.E.R.C. p 61,222, at 62,612 n.4 (1993); 
Western Massachusetts Elec. Co., 66 F.E.R.C. p 61,167, at 61,333 
(1994). Whether WMECO thereby waived the jurisdictional argu-
ment is, however, unnecessary to decide. Because the interconnec-
tions facilitate WMECO's wheeling of qualifying-facility output, the 
analysis is the same for the Altresco and the Masspower agree-
ments. If the Commission had jurisdiction over the Altresco agree-
ments, it also had jurisdiction over the Masspower agreements.

 If a qualifying facility agrees, an electric utility which 
 would otherwise be obligated to purchase energy or 
 capacity from such qualifying facility may transmit the 
 energy or capacity to any other electric utility. Any 
 electric utility to which such energy or capacity is trans-
 mitted shall purchase such energy or capacity under this 
 subpart as if the qualifying facility were supplying ener-
 gy or capacity directly to such electric utility....

18 C.F.R. s 292.303(d).

 The obligation to interconnect is contained in paragraph (c) 
of s 292.303. This critical provision states: "[A]ny electric 
utility shall make such interconnections with any qualifying 
facility as may be necessary to accomplish purchases or sales 
under this subpart." 18 C.F.R. s 292.303(c) (emphasis add-
ed).

 WMECO contends that the Commission ignored the full 
significance of the italicized language in paragraph (c) when it 
asserted jurisdiction over the Altresco agreements. Accord-
ing to WMECO, the obligation to interconnect applies to all 
"purchases or sales under this subpart," which includes indi-
rect sales under paragraph (d)--that is, situations in which 
the interconnecting utility only provides transmission service 
and does not purchase any of the qualifying facility's output. 
Thus, it concludes, the Altresco and Masspower interconnec-
tions should be subject to state, rather than federal, regulato-
ry jurisdiction, even though they involve transmission, rather 
than purchase, by the interconnecting utility.

 Whatever force one may ascribe to WMECO's reading, it 
has not shown the Commission's interpretation to be "plainly 
erroneous" or "inconsistent with the regulations." Auer, 117 
S. Ct. at 911. In "a competition between possible meanings 
of a regulation, the agency's choice receives substantial defer-
ence" so long as it is "logically consistent with the language of 
the regulation" and "serves a permissible regulatory pur-
pose." Rollins Envtl. Servs. (NJ), Inc. v. EPA, 937 F.2d 649, 
652 (D.C. Cir. 1991). The Commission read the interconnec-
tion obligation in s 292.303(c)(1) to be contingent on the 
obligation to purchase in s 292.303(a). The obligation to 

interconnect applies to any electric utility that is purchasing 
all of the output of a qualifying facility. It does not apply, the 
Commission believed, when that utility transmits the energy 
to another utility. WMECO is not purchasing energy from 
Altresco, and although it is purchasing some of Masspower's 
output, it is transmitting the remainder of that output to 
other purchasers. The Commission reads s 292.303(c) as if it 
read "any electric utility shall make such interconnections 
with any qualifying facility as may be necessary to accomplish 
purchases or sales [to it] under this subpart." The "to it" is 
inferred, but properly so, and the Commission's explanation 
offered when it promulgated the regulation demonstrates 
why.

 The statute--PURPA--did not by its terms impose upon 
electric utilities an obligation to interconnect with qualifying 
facilities; the explicit obligation imposed by statute was to 
purchase their output. See 16 U.S.C. s 824a-3(a). When the 
Commission promulgated regulations to implement PURPA, 
it derived an obligation to interconnect. Without an intercon-
nection obligation, the Commission reasoned, a qualifying 
facility seeking to interconnect with an unwilling utility would 
have to obtain an interconnection order from the Commission, 
after going through the potentially time-consuming and costly 
hearing procedures of s 210 of the Federal Power Act. See 
16 U.S.C. s 824i. The Commission designed s 292.303(c) to 
avoid this problem and thereby reduce the burden on small 
power producers. See Small Power Prod. & Cogeneration 
Facilities; Regulations Implementing Section 210 of the 
Public Utility Regulatory Policies Act of 1978, Order No. 69, 
F.E.R.C. Stats. & Regs. (CCH Transfer Binder, Regulations 
Preambles 1977-1981) p 30,128, at 30,873 (1980) ("Order No. 
69"). In its order denying rehearing here, the Commission 
made note of this history. See 61 F.E.R.C. at 61,662 n.17 
(citing Order No. 69, at 30,873). It is therefore not plainly 
erroneous or inconsistent with the regulation to infer that 
s 292.303(c)(1) applies only to purchasing utilities, as 
s 292.303(a) clearly does. The Commission had a solid basis 
for its interpretation of the regulations. The Commission's 
reading of s 292.303(c) is also consistent with s 205 of the 


Federal Power Act. It places the charges for transmission 
under the Commission's jurisdiction, rather than under the 
jurisdiction of the state agency. The Commission also made 
this clear when it promulgated s 292.303(d) in 1980. See 
Order No. 69, at 30,872.

 WMECO asserts that none of the Altresco agreements 
provides for the transmission of energy, that they are all pre-
operational, and that this defeats the Commission's jurisdic-
tion under s 205(c) of the Federal Power Act. The argument 
fails to account for the language of s 205(c), which gives the 
Commission jurisdiction over any contract that "relates to" 
rates and charges for the transmission of electric energy--as 
the Altresco and Masspower agreements surely do. Nor do 
the Commission orders WMECO cites--Coso Energy Devel-
opers, 48 F.E.R.C. p 61,044, at 61,213 (1989), and Gamma 
Mariah, Inc., 44 F.E.R.C. p 61,442, at 62,399 (1988)--provide 
any support for its reading of s 205(c). In both of those 
proceedings, the Commission declined to assert jurisdiction 
because the agreements involved the inclusion of transmission 
facilities as part of the qualifying facilities themselves, rather 
than as part of the interconnecting public utilities. See 61 
F.E.R.C. at 61,664. Those orders therefore do not control 
the Commission's jurisdiction over the Altresco and Masspow-
er agreements, in which the disputed line upgrades will be 
part of WMECO's grid. Cf. American Municipal Power-
Ohio, Inc., 57 F.E.R.C. p 61,358, at 62,161 (1991).

 B

 The second question is whether the Commission properly 
required WMECO to roll the cost of the Altresco and Mas-
spower grid upgrades into its transmission rates.

 With regard to the Altresco agreements, the Commission 
accepted the position of staff witness Tekumalla, who testified 
that any enhancement of an integrated grid system--such as 
the upgrades at issue here--performs a system-wide function 
and provides benefits to all customers on the grid. Having 
considered all the upgrades planned by WMECO and having 
performed a loadflow analysis, Tekumalla provided at least 

three reasons why the upgrades would provide a benefit to all 
users of the transmission grid and not just Altresco. First, 
the physical configuration of the upgrades makes it clear that 
their purpose is not merely to provide a power path from the 
Altresco facility to the WMECO grid--which would benefit 
Altresco alone--but to enhance a system used by many 
customers. Second, the loadflow over the upgraded grid 
facilities will not remain constant. When the flow from 
Altresco is lower than expected, then other grid customers 
will be making use of the upgraded grid facilities. Third, it 
cannot be determined for sure that the upgrades would 
merely restore the transfer capability of the WMECO grid to 
the precise level that existed prior to the Altresco intercon-
nection. In addition, Tekumalla considered the testimony of 
WMECO's engineer and concluded that the engineer's posi-
tion that only Altresco would benefit from the upgrades relied 
upon a level of precision in planning that would have been 
difficult to achieve, given the variability of loadflow conditions 
and modeling techniques.

 One element of reasoned decisionmaking is a demonstrable 
link between the facts found and the choice. See Public 
Utils. Comm'n of New York v. FERC, 813 F.2d 448, 451 (D.C. 
Cir. 1987). Tekumalla's testimony provides the link. Teku-
malla's characterization of the upgrades was based on identi-
fying the beneficiary of the upgrades. The facts he cited 
demonstrate that customers other than Altresco will make 
use of and benefit from the grid upgrades. The choice made 
by the Commission links up with those facts because it 
requires the beneficiaries of the upgrades to bear the costs.

 The Commission's position with regard to assignment of 
costs is, so far as we can tell, part of a consistent policy to 
assign the costs of system-wide benefits to all customers on 
an integrated transmission grid. We have approved the 
underlying rationale of this policy. When a system is inte-
grated, any system enhancements are presumed to benefit 
the entire system. See, e.g., Maine Pub. Serv. Co. v. FERC, 
964 F.2d 5, 8-9 (D.C. Cir. 1992); City of Holyoke Gas & Elec. 
Dep't v. FERC, 954 F.2d 740, 742-43 (D.C. Cir. 1992). Before 
the Commission, WMECO did not dispute the fact that its 


transmission grid was integrated. Rather, it attempted to 
demonstrate why the grid upgrades provided no benefit to 
any customer except Altresco. The Commission instead ac-
cepted staff witness Tekumalla's testimony. As we have said, 
he testified that WMECO's assumptions about the allocation 
of benefits required a level of precision in planning that would 
be difficult to achieve. The Commission's presumption of a 
system-wide benefit was, in short, based on substantial evi-
dence.

 WMECO argues that the Commission failed to consider the 
cost-shifting effects of its order to roll in costs of the system 
upgrades. It claims that requiring all grid customers to bear 
the cost of the upgrades unfairly shifts costs properly borne 
by the qualifying facility--which in turn will reap a windfall 
as a result. It also claims that the Commission's decision 
creates perverse incentives for qualifying facilities to ignore 
economic efficiency in locating their plants because they know 
that the grid customers will foot the bill.

 The Commission did consider the potential for cost shifting, 
however, and found it not to be present in this case. As this 
court has often noted, "we are obliged to defer to [the 
Commission's] technical ratemaking expertise so long as it 
has supplied sufficient reasoning backed up by substantial 
evidence." Pennsylvania Elec. Co. v. FERC, 11 F.3d 207, 
211 (D.C. Cir. 1993) (quoting Alabama Power Co. v. FERC, 
993 F.2d 1557, 1560 (D.C. Cir. 1993)) (internal quotation 
marks omitted). We think that the Commission's rejection of 
WMECO's cost-shifting argument was adequately supported 
by logic and evidence. In any event, WMECO's arguments 
about cost-shifting and perverse incentives are mistaken. If 
a qualifying facility seeking interconnection for transmission 
purposes located its plant far from the utility's lines knowing 
that the interconnection costs would be spread among the 
utility's customers, the utility could simply refuse to transmit 
the power. Although the utility would still have an obligation 
to purchase the qualifying facility's output, see 18 C.F.R. 
s 292.303(a), the qualifying facility, rather than the utility's 
customers, would wind up paying for the interconnection. A 
qualifying facility could not afford to take that risk and 


therefore would do all it could to keep the costs of intercon-
nection to a minimum. Of course, a cogenerator such as 
Altresco would not have much of a choice about where to 
locate its facility because cogenerators need to be near their 
hosts anyway.

 As to the question of cost assignment in the Masspower 
case, we also view the Commission's order as reasonable. 
The Commission found that, in addition to assigning all 
interconnection costs to Masspower, WMECO also intended 
to charge grid customers an increased rate for transmitting 
Masspower's output. The Commission believed that such a 
cost-recovery scheme would have resulted in over-collection of 
costs, contrary to the Commission's transmission pricing 
guidelines. In its request for rehearing, WMECO raised the 
same objection to the Commission's order as it did in the 
Altresco proceeding: the grid upgrades do not benefit the 
entire system but only restore the grid's reliability to the 
status quo. The Commission was not persuaded to deviate 
from its current policy regarding integrated systems. See 
Appalachian Power Co., 63 F.E.R.C. p 61,151, at 61,978, 
supplemental order, 64 F.E.R.C. p 61,327 (1993). In light of 
our holding with regard to the Altresco agreements, we 
cannot say that the Commission erred in applying its policy to 
the Masspower agreements.

 For the foregoing reasons, the petitions for judicial review 
are denied.

 So ordered.